# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| **GEORGETOWN RAIL EQUIPMENT COMPANY,** | § | |
| | § | |
| | § | **CAUSE NO. 6:13-CV-366** |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **HOLLAND L.P.,** | § | |
| | § | |
| **Defendant.** | § | |

## MEMORANDUM AND ORDER

Having considered the parties' written submissions and argument at the June 30, 2015 post-trial hearing, and for the reasons below, the Court rules as follows:

- Holland L.P.'s ("Holland") Motion for Judgment as a Matter of Law (Docket No. 301) is **DENIED**;

- Plaintiff Georgetown Rail Equipment Company's ("Georgetown") Motion for Pre-Judgment and Post-Judgment Interest (Docket No. 298) is **GRANTED**;

- Georgetown's Motion for Permanent Injunction (Docket No. 299) is **GRANTED**;

- Georgetown's Motion for Finding of Willful Infringement (Docket No. 302) is **GRANTED**;

- Georgetown's Motion for Declaration of Exceptional Case and Award of Attorneys' Fees (Docket No. 300) is **GRANTED**; and

- Holland's Motion to Supplement Post-Trial Hearing Record (Docket No. 334) is **GRANTED**.

## BACKGROUND

On May 1, 2013, Georgetown filed this action against Holland alleging that Holland infringes U.S. Patent No. 7,616,329 ("the '329 Patent"). Georgetown's Aurora Track Inspection System competes with Holland's Laser Plate-Cutting System and Line Scan System (collectively, Holland's "Rail Vision Systems") in the track inspection market. The market is essentially composed of only seven customers in the United States, known as "Class I Railroads," who maintain the railroads used to ship goods.

The patent-in-suit generally relates to a system and method for inspecting railroad track using lasers, cameras, and a processor. *See* '329 Patent col. 2:14–34. Specifically at issue in this case is a system for inspecting tie plates. Docket No. 21 at 1. Figure 2 of the '329 Patent, below, shows how a tie plate (14) secures the rail (12) to the crosstie (10) or "sleeper," as well as the lasers (40) and cameras (50) used to detect the tie plates.



'329 Patent, Fig. 2.

"Tie plates may sink or 'cut' into the [crosstie] or break over time." Docket No. 21-9, (Decl. of Greg Grissom, vice president of engineering for Georgetown) ¶ 5. Tie plates may also

be misaligned with respect to the crosstie. Measuring misaligned or sunken tie plates (also known as plate cut or plate cutting) is valuable to Class I Railroads because it allows repairs to be made before the crosstie fails. Historically, the process to measure plate cut required workers to manually walk the tracks and visually inspect each and every tie. Georgetown automated this process, patented the invention, and marketed it under its Aurora mark.

Georgetown asserted only claim 16 at trial. It recites in its entirety:

16. A system for inspecting a railroad track bed, including the railroad track, to be mounted on a vehicle for movement along the railroad track, the system comprising:
at least one light generator positioned adjacent the railroad track for projecting a beam of light across the railroad track bed;
at least one optical receiver positioned adjacent the railroad track for receiving at least a portion of the light reflected from the railroad track bed and generating a plurality of images representative of the profile of at least a portion of the railroad track bed; and
at least one processor for analyzing the plurality of images and determining one or more physical characteristics of the said portion of the railroad track bed, the one or more physical characteristics comprising at least a geographic location of the plurality of images along the railroad track bed, wherein the processor includes an algorithm for detecting a misaligned or sunken tie plate of the railroad track bed, the algorithm comprising the steps of:
(a) analyzing a frame of the plurality of images, the frame comprising a region of interest;
(b) determining whether the region of interest contains a tie plate;
(c) if a tie plate is present, determining a crosstie contour and a tie plate contour;
(d) comparing an orientation of the crosstie contour and an orientation of the tie plate contour; and
(e) determining whether the tie plate is misaligned or sunken based upon the comparison.

'329 Patent col. 11:41–12:2

Notably, claim 16 recites "at least one light generator" and "at least one optical receiver."

'329 Patent col. 11:43, 46. The specification describes the use of a "light generator such as a

laser 40 [and] a device for receiving light reflected from the area to be inspected such as a camera 50," as shown in Fig. 1. *Id.* at col. 3:30–3.



FIG. 1

'329 Patent Fig. 1. Figure 1 also shows how "the cameras 50 are mounted at an angle θ with respect to the beam 42 of light projected from lasers 40." '329 Patent col. 4:33–36. Specifically, the specification provides that:

"[w]ith the beams 42 projected onto the irregular surface of the track and viewed at an angle, the projected line L shown in FIG. 2 follows the contours of the surface and components of the track bed. An example image or frame showing the projected line L of the track bed is shown in FIG. 3. The image data or frame includes a plurality of pixels given X-Y coordinates and shows a contour of the track bed captured by the cameras 50. [Using] image processing techniques known in the art, the image includes two pixel values, where the dark pixels represent the contour of the track bed. Every pixel of a given image data is given the same Z-coordinate, which represents the particular position along the length of

the track at which the image data was captured. In this manner, a plurality of captured images produce a three-dimensional scan of the track bed in which each image of the scan has X-Y coordinates showing the contour of the track bed, and has a Z-coordinate representing the particular position of the contour along the length of rail."

'329 Patent col. 5:31–49. Notably, Fig. 3 provides an example of the contour view of a track bed, where the "dark pixels [appearing as black lines,] represent the contour of the track bed."

'329 Patent col. 5:41, 7:51–52 ("the tie plate 14 and rail 12 are visible" in the contour image).



FIG. 3

'329 Patent, Fig. 3.

Holland places several light generator and optical receivers of its accused Rail Vision Systems on its track inspection vehicles ("TrackStar" vehicles).[1] This data is collected on a hard drive on the TrackStar vehicle, and then sent to non-party Rail Vision Europe Limited, a company based in the United Kingdom ("Rail Vision UK"). Rail Vision UK processes the data to determine the level of plate cut and misalignment in the inspected crossties. The resulting report is delivered back to Holland, who provides the analysis to its customers. Holland's primary noninfringement position through trial was that it only collects the data and does not control Rail Vision UK, who owns the processor and source code to carry out the claimed algorithm. *See generally* Docket No. 260 at 47:14–49:7 (Holland's closing argument).

---

[1] The TrackStar vehicles contain several other systems that measure other railroad characteristics.

Georgetown and Holland are well acquainted—they attempted to combine the Aurora and TrackStar technologies and at one point discussed Holland acquiring Georgetown. A turning point in their relationship that played a significant role in this litigation occurred at a joint demonstration for a potential customer. In January 2012, a Class I Railroad, Union Pacific Railroad, invited both parties to participate in a head-to-head challenge between Holland's Rail Vision Systems and Georgetown's Aurora services on Union Pacific's test track at Yuma, Arizona. PX53 (email from Union Pacific inviting Georgetown and Holland to participate in a joint demonstration); Docket No. 261 (04-06-2015 P.M. Trial Tr., Sealed Portion No. 1) at 22:9–24:7.

Greg Grissom, vice president of engineering for Georgetown, stated that it was at this joint demonstration that Georgetown became aware that Holland's Rail Vision Systems possibly infringed the '329 Patent. *Id.* at 24:8–25:17. Following the joint demonstration, Union Pacific declined to contract with Georgetown and instead entered into a "change order" agreement with Holland. *See* Docket No. 263 (04-7-2015 P.M. Trial Tr., Sealed Portion No. 5) at 70:8–72:13 (Holland's former vice president, Robert Madderom, explaining the change order); PX159. The 2012 change order altered an existing contract Holland had with Union Pacific to allow Holland to provide Rail Vision Systems services ███████████████████████████. *Id.*

After further communications with Holland regarding its Rail Visions Systems, *see* Docket No. 253 (04-07-2015 A.M. Trial Tr.) at 23:24–34:9, Georgetown filed suit for patent infringement on May 1, 2013 and moved for a preliminary injunction on July 11, 2013, Docket No. 21. Magistrate Judge Love found that all four preliminary injunction factors favored granting the injunction: (1) the likelihood of the patentee's success on the merits; (2) irreparable

harm if the injunction was not granted; (3) the balance of hardships between the parties; and (4) the public interest. Docket No. 51 at 5–10. On January 6, 2014, Chief Judge Davis (former presiding judge) adopted Judge Love's recommendation and ordered the preliminary injunction. Docket No. 81.

The litigation proceeded after the Court entered the preliminary injunction. The Court held a five-day trial that concluded on April 10, 2015. After approximately an hour of deliberations, the jury returned a verdict that Holland's Laser Plate-Cutting System and Line Scan System infringed claim 16 of the '329 Patent and that the infringement was willful. Docket No. 273. The jury awarded Georgetown $1,541,333 in damages. *Id.* Both parties have filed post-trial motions that the Court discusses below.

## MOTION FOR JUDGMENT AS A MATTER OF LAW (Docket No. 301)

Holland renews its Rule 50 motion for judgment as a matter of law on the issues of infringement, willfulness, and damages; or, in the alternative, moves for a new trial on those issues.

### *Applicable Law*

Judgment as a matter of law is only appropriate when "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." FED. R. CIV. P. 50(a). The grant or denial of a motion for judgment as a matter of law is a procedural issue not unique to patent law, reviewed under the law of the regional circuit in which the appeal from the district court would usually lie." *ACCO Brands, Inc. v. ABA Locks Mfrs. Co.*, 501 F.3d 1307, 1311 (Fed. Cir. 2007). The U.S. Court of Appeals for the Fifth Circuit "uses the same standard to review the verdict that the district court used in first passing on the motion." *Hiltgen v. Sumrall*, 47 F.3d 695, 699 (5th Cir. 1995). Thus, a jury verdict must be upheld, and judgment as a matter

of law may not be granted, unless "there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did." *Id*. at 700. "A jury verdict must stand unless there is a lack of substantial evidence, in the light most favorable to the successful party, to support the verdict." *Am. Home Assurance Co. v. United Space Alliance*, 378 F.3d 482, 487 (5th Cir. 2004).

A court reviews all evidence in the record and must draw all reasonable inferences in favor of the nonmoving party; however, a court may not make credibility determinations or weigh the evidence, as those are solely functions of the jury. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000) ("Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe."). The moving party is entitled to judgment as a matter of law "only if the evidence points so strongly and so overwhelmingly in favor of the nonmoving party that no reasonable juror could return a contrary verdict." *Int'l Ins. Co. v. RSR Corp.*, 426 F.3d 281, 296 (5th Cir. 2005).

Under Federal Rule of Civil Procedure 59, a new trial may be granted to any party to a jury trial on any or all issues "for any reason for which a new trial has heretofore been granted in an action at law in federal court." "A new trial may be granted, for example, if the district court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 612–13 (5th Cir. 1985). Remittitur is within the sound discretion of the trial court. *Alameda Films S.A. v. Authors Rights Restoration Corp.*, 331 F.3d 472, 482 (5th Cir. 2003).

*Judgment as a Matter of Law of Noninfringement*

Holland describes Georgetown's infringement case as three theories of direct infringement: "(i) Holland sold the entire Rail Vision Systems to Union Pacific, (ii) Holland offered the entire Rail Vision Systems for sale to Union Pacific, and (iii) Holland used the entire Rail Vision Systems in the United States by putting every element of the system into service." Docket No. 318 at 2–3. Holland argues that Georgetown failed to show how the evidence presented at trial supports any of these theories. *Id*. at 3.

Holland first argues that it could not (i) sell or (ii) offer to sell "the patented system" because the patented system "includes a processor and a specific five-step algorithm that is carried out by the processor." *Id*. at 3. That is, Holland claims it "only offered hardware and 'systems required to collect data,' " while Rail Vision UK processed the data. *Id*. at 3–5. Holland argues that under these circumstances, no reasonable jury could conclude that Holland sold or offered to sell the *entire* Rail Vision Systems to Union Pacific. To support this argument, Holland relies on its proposals and agreement with Union Pacific to show that Holland collects the data while Rail Vision UK processes the data. *See, e.g.*, PTX 169 at Schedule I (Holland's equipment lease to Union Pacific, showing ████████████████████████████ ████████); PTX 151 at 3 (2012 track testing proposals that included ████████████ ████████████████████████████████████████████████████████ ████████████████████████). Holland also shows that under their agreements, Rail Vision UK retained all ownership of the software used to process the data. *See, e.g.*, PTX 169 at 12 (Holland's equipment lease to Union Pacific stating that "Rail-Vision will retain ownership of the data collection and processing software provided through this Agreement").

Holland next argues that Georgetown has not shown that (iii) "Holland uses the entire system of Claim 16 by putting all of the elements of the Rail Vision Systems into service, i.e., by showing that Holland benefitted from and controlled the Rail Vision Systems as a whole." Docket No. 318 at 8. Holland admits that it contracted with Union Pacific and received payment from Union Pacific, but argues that is insufficient to demonstrate control over the entire Rail Vision Systems. *Id*. at 9. Likewise, Holland argues that it does not control the entire Rail Vision System because it neither owns nor develops the Rail Vison UK software. Docket No. 257 (04-09-2015 A.M. Trial Tr.) at 63:3–6 ("Holland had nothing to do with developing [Rail Vision UK's] software"). Finally, Holland argues that Georgetown failed to show Holland benefited from the Rail Vision Systems because (1) Georgetown's damages expert admitted Union Pacific never paid for the accused Rail Vision Systems and (2) Georgetown failed to show that any alleged revenue was for the accused technology, as opposed to noninfringing uses of the Rail Vision Systems. Docket No. 318 at 10.

By the time Holland filed its reply brief, the parties appeared to agree on the law governing Georgetown's infringement case. Docket No. 311 at 3–4; Docket No. 318 at 8 n.5. That is, because Rail Vision UK processed the data in the United Kingdom, Georgetown must show that Holland controlled and benefited from the accused Rail Vision Systems as a whole in the U.S. *Centillion Data Systems, LLC v. Qwest Communications Int'l. Inc.*, 631 F.3d 1279, 1284 (Fed. Cir. 2011) ("We hold that to 'use' a system for purposes of infringement, a party must put the invention into service, i.e., control the system as a whole and obtain benefit from it."); *NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1317 (Fed. Cir. 2005) (abrogated on other grounds, *see IRIS Corp. v. Japan Airlines Corp.*, 769 F.3d 1359, 1361 n.1 (Fed. Cir. 2014)) ("The use of a claimed system under section 271(a) is the place at which the system as a whole is

put into service, i.e., the place where control of the system is exercised and beneficial use of the system obtained.").

While Georgetown consistently characterized its infringement case in this manner, Holland frequently (but erroneously) claimed throughout the litigation that there is no "single party infringer" because Rail Vision UK processes the data. *See Centillion*, 631 F.3d at 1284 ("The district court erred, however by holding that in order to 'use' a system under § 271(a), a party must exercise physical or direct control over each individual element of the system."). Holland cannot escape liability merely because it contracted Rail Vision UK to perform the data processing steps of the asserted system claim. *See Golden Hour Data Sys., Inc. v. emsCharts, Inc.*, No. CIV A 2:06 CV 381, 2009 WL 943273, at *3 (E.D. Tex. Apr. 3, 2009), *aff'd*, 614 F.3d 1367 (Fed. Cir. 2010) ("A party cannot avoid infringement, however, simply by contracting out steps of a patented process to another entity. In those cases, the party in control would be liable for direct infringement.") (citation and quotation marks omitted).

As both parties now agree, the correct standard is whether Holland controlled and benefited from the Rail Vision Systems as a whole. Accordingly, Holland's cited evidence that it collects the data while Rail Vision UK processes the data is only relevant in so much as it answers that question. As detailed below, Georgetown provided a legally sufficient evidentiary basis for the jury to find that Holland exercised control over the Rail Vision Systems and benefited from that system. Therefore, Holland's 2012 change order with Union Pacific to provide the Rail Vision Systems is an offer to sell the Rail Vision Systems and Holland's 2012 demonstration in Yuma is a use of the Rail Vision Systems.

Robert Madderom, Holland's former vice president, testified extensively on this topic, describing the very exhibits that Holland now relies on as evidence that Holland did not benefit from or control the Rail Vision Systems as a whole:

Holland paid Rail Vision UK to develop the infringing technology and to specifically move Rail Vision's software in the direction of grading wood ties. Docket No. 263 (04-07-2015 P.M. Trial Tr., Sealed Portion No. 5) at 106:13–108:20 (Madderom); PX111 (email exchange between Holland and Rail Vision UK to develop the Rail Vision Systems on Holland's TrackStar vehicles).

Holland operated its TrackStar vehicle(s) equipped with the Rail Vision Systems in the United States. Docket No. 254 (04-07-2015 P.M. Trial Tr.) at 53:21–54:9 (Madderom).

Holland contracts with customers in the United States to use its Rail Vision Systems. Docket No. 263 (04-07-2015 P.M. Trial Tr., Sealed Portion No. 5) 11:18–14:14 (Madderom).

Holland's contracts with its customers required the customers to pay Holland, not Rail Vision UK, for use of the Rail Vision Systems. *Id*. at 70:10–71:18 (Madderom); PX168).

Holland collected the data to be processed by the Rail Vision Systems for its customers in the United States. *Id*. 7:5–8:6 (Madderom).

Holland sends the collected data to Rail Vision UK, instructing Rail Vision UK to process the data in order to provide information to Holland's customers. *Id*. at 10:24–11:3, 11:7–12, 49:11–16 (Madderom); PX130.

Holland pays Rail Vision UK to process the data that Holland collects in the United States. *Id*. at 48:2–8 (Madderom).

Holland provides Rail Vision UK with its customers' unique specifications for the purpose of directing Rail Vision on how to process the data. *Id*. at 12:22–15:5 (Madderom); PX138.

Holland, not Rail Vision UK, decides which customers to approach and how much to charge them. *Id*. at 12:10–14 (Madderom).

Holland earned approximately ███████ of revenue from the Rail Vision Systems before it was preliminary enjoined. *Id*. at 84:18–85:12 (Madderom); PX67.

Holland, not Rail Vison UK, entered into a ███████████ contract with Union Pacific Railroad that included work using the infringing Rail Vision technology. PX158.

Holland, not Rail Vision UK, entered into a separate lease with Union Pacific under which Holland installed the infringing Rail Vision Systems on a Union Pacific-owned vehicle. PX168; PX169.

Holland received ██████ for installing that system, ████ monthly lease and data processing revenues for supporting the infringing system. Docket No. 263 (04-07-2015 P.M. Trial Tr., Sealed Portion No. 5) at 50:13–53:13; 53:14–55:18 (Madderom); PX168; PX169.

Mr. Madderom testified that cross-ties were "absolutely" the "quickest opportunity to generate market value and revenue from [the small number of] customers." *Id*. at 109:14–16 (Madderom).

Holland has provided no basis for the Court to reevaluate the evidence, which must be viewed in the light most favorable to the verdict. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000). A reasonable jury could find that Holland exercised control of and benefited from the Rail Vision Systems where Holland (1) decides which customers to approach, Docket No. 263 (04-07-2015 P.M. Trial Tr., Sealed Portion No. 5) at 11:7–12:21; (2) decides how much to charge for the Rail Vision Systems, *id*.; (3) receives all revenue from Rail Vision Systems, *id*.; (4) collects the data for the Rail Vision Systems and directs Rail Vision UK on how to process the data collected from Holland's equipment, *id*. at 12:22–15:5; and (5) entered into a ██████████ change order agreement with Union Pacific allowing Holland to provide the Rail Vision Systems to Union Pacific, PX159.

Holland's arguments to the contrary are not persuasive. Holland argues it does not control the Rail Vision Systems because Holland does not own the claimed processor or software, it never mounted the processor on its track inspection vehicles, and the contracts (and proposals) sent to customers specify different rates for data collection and data processing. *See, e.g.*, Docket No. 318 at 4–6. However, Holland need not have physical control and ownership of

each claimed system component (i.e., the processor) to meet the control and benefit standard. *See Centillion*, 631 F.3d at 1284 ("The district court erred, however by holding that in order to 'use' a system under § 271(a) party must exercise physical or direct control over each individual element of the system."). Likewise, the fact that Holland itemized its contracts (at rates that Holland, not Rail Vision UK, set) is not sufficient to overturn an otherwise supportable jury finding that Holland controlled the accused system. Finally, Holland's argument that it did not benefit from the Rail Vision System because it never received payment from Union Pacific is without merit. Holland was preliminary enjoined from putting the Rail Vision Systems into use, so it could not offer the services it was contractually allowed to provide.[2]

Holland makes one argument separate from the control and benefit test. Holland argues that "[e]ven if a reasonable jury could determine that Holland obtained the benefit of and controlled the entire system, no reasonable jury could find that the data was processed using the specific five-step algorithm required in Claim 16." Docket No. 301 at 26. Holland's infringement expert, Dr. John Martens, explained that the Rail Vision Systems cannot infringe because ███████████████████████████████████████████████████████████ ████████████████████████████████. *Id.*; Docket No. 267 (04-10-15, 2015 A.M. Trial Tr., Sealed Portion No. 12) at 21:2–13. The jury heard this testimony and was free to balance it against Georgetown's evidence that the Rail Vision algorithm includes every element of the claimed algorithm. *See, e.g.*, Docket No. 264 (04-08-2015 P.M. Trial Tr., Sealed Portion No. 6) at 23:2–56:23 (Dr. Harley Myler, Georgetown's infringement expert, testifying that each claim element is present in the Rail Vision Systems). The jury resolved this contrasting testimony, and

---

[2] Even if Holland could rely on the preliminary injunction as evidence that it cannot infringe, there was other evidence presented that Holland received the benefit of the system. *See, e.g.*, Docket No. 311 at 5–6 (receiving ████████ from the Rail Vision Systems prior to injunction and receiving ████████ for installing Rail Vision Systems on a Union Pacific vehicle).

all the attendant credibility determinations, *see* Docket No. 311 at 11 (identifying Georgetown's cross-examination of Dr. Martens), in Georgetown's favor.

Accordingly, because there is substantial evidence to support the jury's finding of infringement, the Court **DENIES** Holland's motion for judgment as a matter of law as to noninfringement.

### Judgment as a Matter of Law of No Willful Infringement

For the reasons stated with respect to Georgetown's Motion for Finding of Willful Infringement below, the Court **DENIES** Holland's motion as to willfulness.

### Judgment as a Matter of Law that Georgetown is Not Entitled to Lost Profits

At trial, Georgetown based its damages case on a lost profits model that centered on the 2012 change order agreement between Union Pacific and Holland. The change order contemplated that Holland would continue to provide its existing services to Union Pacific, but allowed Holland to perform Rail Vision Systems services ███████████████████. Docket No. 350 (04-09-2015 P.M. Trial Tr., Sealed Portion No. 26) at 3:3–4:23; DTX 33; DTX 38. Approximately 10 months after Holland entered into the change order with Union Pacific, the Court granted Georgetown's motion for preliminary injunction, which prevented Holland from performing any Rail Vision Systems services. *See* Docket No. 21.

Georgetown's damages expert, Dr. Keith Ugone, testified that had Union Pacific selected Georgetown instead of Holland, Union Pacific would have entered into a contract for ███████ with Georgetown. Docket No. 265 (04-09-2015 A.M. Trial Tr., Sealed Portion No. 7) at 30:25–32:8 (testifying that Georgetown would have inspected ██████ miles of track at a rate of ████ per mile). According to Dr. Ugone, Georgetown's profits resulting from this hypothetical contract equaled $1,541,333. *Id*. at 38:4–10. Holland argued that Georgetown did not establish

any lost profits and that the jury should not have awarded damages. Docket No. 258 (04-09-2015 P.M. Trial Tr.) at 41:13–23 (Daniel Jackson, Holland's damages expert). The jury returned a verdict for Georgetown's requested amount of $1,541,333. Docket No. 273.

The parties' damages models followed the traditional *Panduit* factors for lost profits. *Panduit Corp. v. Stahlin Bros., Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978). The factors are: (1) demand for the patented product, (2) absence of acceptable noninfringing substitutes, (3) capacity to exploit the demand, and (4) the amount of profit Georgetown would have made but for Holland's infringement. *See id.* In cases that involve a two-supplier market and demand for the patented product, the first two *Panduit* factors collapse into one "two suppliers in the relevant market factor." *Micro Chem., Inc. v. Lextron, Inc.*, 318 F.3d 1119, 1124 (Fed. Cir. 2003).

Georgetown provided substantial evidence on each of the *Panduit* factors to support the jury's verdict. For *Panduit* factor (1), Georgetown showed the demand for the patented product. *See, e.g.*, Docket No. 262 (04-07-2015 A.M. Trial Tr., Sealed Portion No. 4) 42:3–43:5 (Joan Maier, Georgetown's chief financial officer, stating that Georgetown generated ███████ from Aurora); PX236 (Aurora financial data); Docket No. 261 (04-06-2015 A.M. Trial Tr., Sealed Portion No. 1) at 20:21–22:14 (Grissom stating that Georgetown entered into contracts with four of the seven Class I Railroads). Holland likewise agreed that its customers wanted a technology to automate the measurement of plate cutting. Docket No. 263 (04-07-2015 P.M. Trial Tr., Sealed Portion No. 5) at 18:20–20:14 (Madderom explaining that measuring plate cutting was a "high goal[]" for Holland).

For *Pandiut* factor (2), Georgetown provided substantial evidence that it and Holland were the only two suppliers measuring plate cutting in the United States. Docket No. 252 (04-

06-2015 P.M. Trial Tr.) at 91:6–14 (Grissom's testimony); Docket No. 255 (04-08-2015 A.M. Trial Tr.) at 38:4–14 (testimony of Georgetown's former vice president of Marketing, Lynn Turner). Dr. Ugone analyzed the relevant market and testified that Georgetown and Holland are the "sole providers" of this technology. Docket No. 257 (04-09-2015 A.M. Trial Tr.) at 17:12–25. In its reply brief, Holland appears to concede that Holland and Georgetown were the only competitors in the relevant market. *See generally* Docket No. 318 at 19–20 (stating that the only companies Union Pacific could have partnered with to automate the measuring of plate cut were Holland and Georgetown).[3]

Holland did not dispute that Georgetown satisfied *Panduit* factor (3), which requires Georgetown to show it has capacity to perform under the contract that it lost to Holland. Georgetown and its expert took into account the capital expenditures, including the costs to build additional Aurora vehicles, when reconstructing the market and addressing Georgetown's capacity to perform the patented services for Union Pacific. Docket No. 265 (04-09-2015 A.M. Trial Tr., Sealed Portion No. 7) at 34:12–35:14 (Dr. Ugone explaining Georgetown could add several ▉▉▉▉▉▉ vehicles to meet this capacity); Docket No. 262 (04-07-2015 A.M. Trial Tr., Sealed Portion No. 4) at 40:20–41:7 (Maier testifying the cost of ▉▉▉▉▉▉ per truck). Accordingly, there is substantial evidence to support this factor.

For *Panduit* factor (4), Georgetown provided substantial evidence in support of its calculation of lost profits. Dr. Ugone calculated the total revenues that Georgetown would have obtained under its hypothetical contract with Union Pacific. Docket No. 265 (04-09-2015 A.M.

---

[3] Holland, in its opening brief, identified other competitors of Georgetown who were also "in the machine vision tie-inspection market." Docket No. 301 at 47 n.17. However, the patented technology, and the relevant market for damages calculation, relates to companies who can automate the measuring of plate cutting. *See Micro Chem.*, 318 F.3d at 1124 (The relevant market excludes alternatives "with disparately different prices or significantly different characteristics"). Holland did not mention these competitors in its reply brief or at the hearing.

Trial Tr., Sealed Portion No. 7) at 30:25–32:21.  For input, Dr. Ugone considered Georgetown's four existing contracts with Class I Railroads, (PX21 ███████; PX23 ███████; PX25 ████████████; PX27 ████████████████) ████████████████████████████████████████ (PX32 and PX57).  Dr. Ugone then deducted costs that Georgetown would have incurred to generate those revenues.  Docket No. 265 (04-09-2015 A.M. Trial Tr., Sealed Portion No. 7) at 32:22–36:2.  These deductions included job costs, capital expenditures (such as the ████████ cost to build an Aurora truck), and a deduction for net-present value using Georgetown's discount rate of 20 percent.  *Id*. at 36:6–38:8.  Applying these deductions, Dr. Ugone arrived at a lost profits calculation of $1,541,333.  *Id*. at 38:4–10.  Holland and its damages expert offered no competing calculation of lost profits and chose, instead, to rest Holland's damages defense on the issue of causation.

Holland presents three challenges to Georgetown's evidence.  First, Holland argues that because Holland never received any money for its infringing technology, Georgetown is legally precluded from receiving any lost profits damages.  Docket No. 330 at 79:5–7 ("The inquiry ends right there, Your Honor.  With no sales by Holland of the accused infringing technology, there are no lost profits, period.  Zero.").  That is, Holland claims that Georgetown cannot show "but for" causation: Georgetown allegedly never shows that but for Holland's infringement, it would have made sales to Union Pacific.  Second, Holland argues that because Union Pacific never used the infringing technology (either by partnering with Holland, Georgetown, or developing it itself), Georgetown did not have substantial evidence for *Panduit* factor (1) demand of the patented product.  Docket No. 330 at 86:1–10; Docket No. 318 at 20 ("Union Pacific could choose any of the following: (i) partner with Holland, (ii) partner with Georgetown, (iii) partner with both, (iv) use its own internal technology, or (v) do nothing.").  Finally, Holland

argues that Georgetown's damages expert, Dr. Ugone, miscalculated the amount of profits Georgetown could potentially show based on the 2012 change order agreement. Docket No. 318 at 12–20.

Holland's first argument is without legal support and is somewhat misleading. Holland was enjoined from performing its Rail Vision Systems services as contemplated by the Union Pacific change order. *See* Docket No. 21. Holland argues that Dr. Ugone never explained to the jury that the injunction prevented any sales; rather, Dr. Ugone only said that "for a variety of reasons" Holland never made a sale to Union Pacific for its Rail Vision Systems. Docket No. 265 (04-09-2015 A.M. Trial Tr., Sealed Portion No. 7) at 46:20–47:11. In fact, Dr. Ugone could not have discussed the preliminary injunction because the Court granted Holland's motion in *limine* to prevent testimony about the preliminary injunction in front of the jury. Docket No. 202 at 2. Moreover, Holland provides no legal support for its theory that a preliminary injunction can be used to prevent a claim for lost profits. Holland essentially argues for a rule that if a patentee enjoins a competitor from performing infringing services on a contract with a customer, the patentee is barred from seeking lost profits based on that lost opportunity.

The lost profits inquiry focuses on the profits Georgetown lost, not on the profits the accused infringer made. *See Brooktree Corp. v. Advanced Micro Devices, Inc.*, 977 F.2d 1555, 1579 (Fed. Cir. 1992) ("In patent cases, as in other commercial torts, damages are measured by inquiring: had the tortfeasor not committed the wrong, what would have been the financial position of the person wronged?"). Holland argues that Georgetown's evidence for lost profits is too speculative: Holland never made *any* sales to Union Pacific, so Georgetown presumes too much by claiming that it would have made any sales to Union Pacific. Docket No. 318 at 15–16, 330 at 77:24–78:11. The jury, however, accepted Georgetown's evidence. The question now is

simply whether that evidence was substantial enough to support an award for lost profits. The evidence at trial showed that (1) Union Pacific wanted the technology, *see, e.g.*, Docket No. 263 (04-07-2015 P.M. Trial Tr., Sealed Portion No. 5) at 20:7–20:21 (Madderom stating that Union Pacific wanted to automate plate cut measuring); (2) Union Pacific signed a change order agreement that contemplated Holland providing the services at a lower price than Georgetown, *see* PX159; (3) Holland booked some initial revenue associated with its data collection services, *see, e.g.*, Docket No. 263 (04-07-2015 P.M. Trial Tr., Sealed Portion No. 5) at 84:18–85:12 (Madderom stating that Holland's revenue from its Rail Vision Systems was ███████████ ███████████); (4) and meanwhile, Georgetown continued to offer its services to other Class I Railroads at rates that informed Dr. Ugone's lost profits model, *see, e.g.*, Docket No. 265 (04-09-2015 A.M. Trial Tr., Sealed Portion No. 7) at 32:3–32:16. In light of the above, Georgetown provided substantial evidence to support the lost damages award.

Holland's second argument—that Union Pacific did not demand the patented technology—is factually misplaced. Holland argues that Union Pacific was free to partner with either Holland or Georgetown or develop the technology itself, but did not do so, and therefore Union Pacific did not demand the patented technology. Docket No. 318 at 20. Union Pacific was not so free. Holland could not provide its services due to the preliminary injunction and Union Pacific could have reasonably been waiting for the outcome of this litigation to select the lower cost provider. Likewise, Holland's argument that Union Pacific had no demand for the technology because Union Pacific never attempted to develop a noninfringing alternative on its own is without merit. There is nothing in the record that suggests Union Pacific had such capability. Even if it did, simply stating that a customer did not develop a solution on its own is not the same thing as finding that customer does not have any demand for that solution.

Holland's third argument—that Dr. Ugone miscalculated the amount of profits—was presented to the jury, which weighed the evidence and returned a verdict for Georgetown. Dr. Ugone argued that but for Holland's infringement, Georgetown would have made ████████ in sales to Union Pacific. Holland lists several "unsupported assumptions" that Dr. Ugone allegedly made in reaching this number. *See* Docket No. 301 at 40–44 (not accounting for the fact that Union Pacific ██████████████████████████; assuming that this was a two-supplier market; and assuming that Union Pacific would have entered into a per mileage rate with Georgetown rather than the ████████ contract it entered with Holland).

Holland challenged Dr. Ugone on each of these points at trial. Dr. Ugone presented countervailing testimony to reconstruct a contract that Georgetown would have entered with Union Pacific but for Holland's infringement. To do so, Dr. Ugone relied on Georgetown's history with Union Pacific, Holland's change order agreement with Union Pacific, and Georgetown's existing contracts with other Class I Railroads. The Court draws all reasonable inferences from this evidence in Georgetown's favor as the nonmovant, and determines that there is substantial evidence to support the jury's verdict of $1,544,333. *See Reeves*, 530 U.S. at 150–51.

Accordingly, there is substantial evidence to support the jury's finding of lost profits and the Court **DENIES** Holland's motion for judgment as a matter of law as to lost profits.

Finally, Holland provides no basis for a new trial on any of these issues. Having denied each request in Holland's Motion for Judgment as a Matter of Law (Docket No. 301), the Court **DENIES** the Motion in its entirety.

**MOTION FOR PRE-JUDGMENT AND POST-JUDGMENT INTEREST (Docket No. 298)**

Georgetown requests that the Court award "pre-judgment interest at the prime rate compounded quarterly from September 1, 2012 through the date on which this Court enters judgment." Docket No. 298-1 (Proposed Order). Holland argues that if the Court awards pre-judgment interest to Georgetown it should use the one-year Treasury Bill rate compounded annually. Docket No. 307 at 2. In keeping with the standard practice of this District, the Court **ORDERS** Holland to pay Georgetown pre-judgment interest at the prime rate compounded quarterly from September 1, 2012 through the date on which the Court enters final judgment. *See VirnetX, Inc. v. Apple Inc.*, No. 6:10-cv-417, Docket No. 732 at 35 (listing a sample of cases where the Court awarded pre-judgment interest on the damages at the prime rate compounded quarterly). Further, the Court **ORDERS** Holland to pay Georgetown post-judgment interest at the statutory rate upon entry of judgment as proscribed by 28 U.S.C. § 1961.

Accordingly, Georgetown's Motion for Pre-Judgment and Post-Judgment Interest (Docket No. 298) is **GRANTED**.

**MOTION FOR PERMANENT INJUNCTION (Docket No. 299)**

In addition to the damages award, Georgetown requests the entry of a permanent injunction enjoining Holland from infringing claim 16 of the '329 Patent. Docket No. 299 at 1. Georgetown provides the exact language for the injunction at Docket No. 299-1. The requested injunction requires Holland to notify relevant suppliers, distributors, customers, and other third parties of the permanent injunction. Docket No. 299-1 at 2. Holland argues that a permanent injunction is not warranted in this case because there is no ongoing infringement. Docket No. 308 at 1. Holland further argues that a permanent injunction—if granted—should not include Georgetown's requirement that Holland notify third parties and also objects to Georgetown's

definition of "Enjoined Parties," which includes "persons in active concert or participation with [Holland]," as impermissibly broad and vague.  Docket No. 308 at 10.

*Applicable Law*

The Patent Act provides courts with the authority to "grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable."  35 U.S.C. § 283.  To obtain a permanent injunction, Georgetown must show: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).  Courts have broad latitude to issue permanent injunctions, and orders on such motions are evaluated under the abuse of discretion standard.  *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 861 (Fed. Cir. 2010).

*Analysis*

The only remaining disputed factor is irreparable harm (*eBay* factor 1).[4]  Holland asserts that there is no immediate or irreparable harm because Holland "is not presently infringing nor does it have any plans to do so."  Docket No. 308 at 5–6.  Holland further contends that there is no "causal nexus between Holland's alleged infringement and Georgetown's perceived harm" because Georgetown was able to enter into service contracts with four of the seven Class I Railroads.  *Id.* at 7.  Finally, Holland argues Georgetown has not shown irreparable harm in the

---

[4] Holland did not address *eBay* factor 2 (lack of adequate remedy at law) and *eBay* factor 3 (balance of hardships). *See generally* Docket No. 308.  Holland argued that there is no public interest for a permanent injunction (*eBay* Factor 4) while there is a pending reexamination.  *Id.* at 9.  That argument is now moot in light of termination of the reexamination.  *See* Docket No. 354.

market of "track inspection services," which Holland submits is the market Georgetown bases its request on.  Docket No. 308 at 7.

Georgetown does not license the '329 Patent, but offers its patented services directly to its customers.  *See* Docket No. 252 (04-06-2015 P.M. Trial Tr.) at 101:24–102:14 (Grissom describing Georgetown's business model).  Additionally, the trial record established that Georgetown and Holland are direct competitors in the relevant market—companies that can automate the process to measure plate cutting.  *Id*. at 93:1–17 (Grissom stating that Georgetown and Holland are the only two companies that measure sunken and misaligned tie plates); Docket No. 265 (04-09-2015 A.M. Trial Tr., Sealed Portion No. 7) at 52:7–11 (Dr. Ugone testifying this is a two-competitor market); Docket No. 263 (04-07-2015 P.M. Trial Tr., Sealed Portion No. 5) at 12:15-21; 62:21-24, 113:4-10 (Madderom saying that Holland's customers are Class I Railroad companies).

Georgetown's statutory right to exclude competitors from practicing the '329 Patent is self-evident in this situation.  *See Acumed LLC v. Stryker Corp.*, 551, F.3d 1323, 1328 (Fed. Cir. 2008) ("The essential attribute of a patent grant is that it provides a right to exclude competitors from infringing the patent.").  Denying an injunction effectively requires Georgetown to grant a compulsory license to Holland with the attendant consequences that increased competition in the market brings, such as lost sales, foregone business relationships, and depressed pricing.  *See* Docket No. 265 (04-09-2015 A.M. Trial Tr., Sealed Portion No. 7) at 4:4–5:19 (Dr. Ugone describing the consequences in this small market).

In light of this evidence, Holland's statement that "it has no plans" to infringe carries little weight.  The harm from infringement in a market with only seven customers is real and substantial.  Holland's causal nexus argument is similarly unconvincing.  Contrary to Holland's

argument, the fact that Georgetown sold its Aurora services to several other Class I Railroads but was unable to contract with Union Pacific (which instead chose Holland's infringing service) is evidence of a casual nexus between Holland's infringement and Georgetown's harm. Georgetown offered an industry-acceptable service, yet lost the sale to Union Pacific, which elected to use an infringing service. Even if Georgetown succeeds in future contracts for Aurora, a competing and infringing product on the market will depress prices. Accordingly, all four *eBay* factors support the granting of a permanent injunction.

Having found a permanent injunction is warranted, Holland fails to show why the proposed notice provision of the permanent injunction is punitive. The notice provision reads as follows:

> IT IS FURTHER ORDERED that, within ten (10) business days of the entry of this Order, Holland shall provide notice of this Permanent Injunction to all suppliers, distributors, customers, and other third parties who have: (1) ordered, received, leased, or purchased the Rail Vision Systems from Holland; (2) received services from Holland using the Rail Vision Systems; or (3) supplied the Rail Vision Systems to Holland.

Docket No. 299-1 (Proposed Permanent Injunction). Holland argued in its briefing and at the post-trial hearing that "throughout the trial, the only evidence concerning Holland's alleged infringement surrounded the joint demonstration with Georgetown in 2012 for Union Pacific." Docket No. 308 at 5–6. While this is not an accurate characterization of the evidence, *see* Docket No. 314 at 2 n.1 (identifying evidence that Holland used, sold, and offered to sell the infringing system on multiple occasions), it reveals Holland's position that, based on the trial evidence, the only entities who would receive notice of the permanent injunction are Union Pacific and Rail Vision UK. Holland is not punished by having these parties receive notice of the permanent injunction because these parties are already aware of the litigation and preliminary injunction. To the extent that other parties have ordered or supplied the Rail Vision Systems,

Holland offers no argument about their existence or how Holland would be punished by their receiving notice of the permanent injunction.

Finally, the Court accepts Georgetown's language of "Enjoined Parties" as "persons in active concert or participation with [Holland]." Docket No. 308 at 10. Given the nature of Rail Vision UK's involvement, this language is necessary. Additionally, the Federal Rules of Civil Procedure expressly include this language. FED. R. CIV. P. 65(d)(2)(c); *see also Power-One, Inc. v. Artesyn Techs., Inc.*, 2008 WL 1746636, at *2 (E.D. Tex. Apr. 11, 2008) *aff'd*, 599 F.3d 1343 (Fed. Cir. 2010).

For the above reason, Georgetown's Motion for Permanent Injunction (Docket No. 299) is **GRANTED**, and the Court will enter the injunction order separately.

### MOTION FOR FINDING OF WILLFUL INFRINGEMENT (Docket No. 302)

As stated above, the jury found that Holland willfully infringed claim 16 of the '329 Patent. Georgetown now moves for a finding of willfulness from the Court and enhanced damages under 35 U.S.C. § 284.

### *Background*

Georgetown invested several years and millions of dollars developing its Aurora Track Inspection System. Docket No. 262 (04-07-2015 A.M. Trial Tr., Sealed Portion No. 4) at 45:4–6. Georgetown applied for patent protection for the Aurora technology in June of 2004 and was awarded a patent in 2009. Docket No. 263 (04-07-2015 P.M. Trial Tr., Sealed Portion No.5) at 27:3–6 (Chris Villar, former Georgetown engineer and named inventor of the '329 Patent); PX1, PX2. Aurora is a commercial embodiment from the '329 Patent. At trial, the parties stipulated that Georgetown has and does practice claim 16 of the '329 Patent. Docket No. 271 (final jury instructions) at 5.

Holland and Georgetown's customers are interested in minimizing track time, which is the time service and maintenance work is done on railroads. Docket No. 255 (04-08-2015 A.M. Trial Tr.) at 49:21–25. In an effort to minimize track time, service companies, though competitors, often coordinate their work. *Id.* To that end, Holland and Georgetown discussed putting the Aurora technology onto Holland's TrackStar vehicles as early as 2005. Docket No. 263 (04-07-2015 P.M. Trial Tr., Sealed Portion No. 5) at 85:25–92:4. As part of these discussions, Holland signed a 2006 non-disclosure agreement with Georgetown. PX69 (April 28, 2006 non-disclosure agreement). Negotiations for the Aurora technology fell off and in 2008 Holland terminated its non-disclosure agreement with Georgetown. Docket No. 263 (04-07-2015 P.M. Trial Tr., Sealed Portion No. 5) at 92:5–93:19; PX78 (March 3, 2008 letter terminating the April 28, 2006 non-disclosure agreement).

Despite this setback, developing an automated system for measuring plate cutting remained one of Holland's "highest priorit[ies]." *Id.* 19:25–20:9 (Madderom); PX110. Holland became acquainted with Rail Vision UK, a company that in 2008 was focused on the noninfringing technology of detecting concrete ties. *Id.* at 93:16–94:9. Holland entered into financial agreements with Rail Vision UK "to move in the area of wood tie assessment." Docket No. 257 (04-09-2015 A.M. Trial Tr.) at 57:6–9. Holland then directed Rail Vision to build the infringing Rail Vison Systems. Docket No. 263 (04-07-2015 P.M. Trial Tr., Sealed Portion No. 5) at 14:15-19 (Holland sending Union Pacific's tie rating guidelines to Rail Vision UK). However, by the end of 2009, Holland was concerned that Rail Vision couldn't "get [Holland] to the end line." Docket No. 258 (04-09-2015 P.M. Trial Tr.) at 5:22–23 (Madderom explaining why Holland was having conversations with both Georgetown and Rail Vision UK about installing machine vision systems on TrackStar vehicles). During this same time frame (late

2009), Holland even considered acquiring Georgetown outright and entered into discussions with Georgetown's upper management about that possibility. Docket No. 348 (04-08-2015 A.M. Trial Tr., Sealed Portion No. 20) at 3:15–4:9 (Turner describing the discussions), 11:2–12:7 (Holland describing the discussions).

That possibility was abandoned and the companies instead focused on putting the Aurora technology on Holland's TrackStar vehicles. Georgetown testified that in January 2010, Holland contacted Georgetown and was "really pushing for a meeting to discuss the possibility of partnering up and putting the Aurora system on their inspection trucks." Docket No. 255 (04-08-2015 A.M. Trial Tr.) at 53:2–6; PX80 (Jan. 2010 email from Holland). Holland told Georgetown that it was "keenly interested in understanding how the Aurora technology has advanced and to what level the customers are accepting the value." Docket No. 263 (04-07-2015 P.M. Trial Tr., Sealed Portion No. 5) at 96:6–14 (Madderom); PX81 (Jan. 2010 email from Holland). In April 2010, Holland and Georgetown signed another non-disclosure agreement, PX92, and the parties met in person several times from January 2010 to June 2010 to explore Holland's renewed interest in Aurora. *See* PX83–85, 88–90, 95–98. Following a discussion about pricing, Holland decided that Georgetown's Aurora technology was too expensive and terminated its discussions with Georgetown in June 2010. PX99.

Throughout these events, Georgetown was unaware that Holland had been working with Rail Vision UK to develop the infringing Rail Vision Systems. Docket No. 266 (04-09-2015 P.M. Trial Tr., Sealed Portion No. 10) at 7:5–8:18 (Madderom testifying Holland had ongoing discussions with Rail Vision UK); PX251 (April 26, 2010 document Holland sent to Rail Vision UK that referenced prior discussions). Indeed, Holland had maintained its business relationship with Rail Vision UK to develop the infringing technology since early 2009. PX103, PX107–

109.  Holland, in fact, was working with Rail Vision UK to install the infringing technology on its vehicles while it was in discussions with Georgetown.  *See, e.g.*, PX111, PX112, PX251.  On May 24, 2010, Holland signed a purchase work order for the infringing technology.  PX114.

Georgetown, still unaware that Holland's Rail Vision Systems could measure plate cut, participated in a joint demonstration with Holland for Union Pacific in 2012.  Holland, knowing Georgetown's standard pricing for its Aurora technology, offered its competing Rail Vision Systems for a lower price.   Docket No. 263 (04-07-2015 P.M. Trial Tr., Sealed Portion No. 5) at 67:11–68:13 (Madderom discussing Holland's proposal); PX150 (Holland's proposal from █████ █████); Docket No. 265 (04-08-2015 P.M. Trial Tr., Sealed Portion No. 7) at 19:2–4 (Dr. Ugone stating that Georgetown's proposal started at ████ per mile).  As a result, Georgetown lost the contract because it wasn't "the lowest bidder."  Docket No. 262 (04-07-2015 A.M. Trial Tr., Sealed Portion No. 2) at 8:12–16; PX59 (Oct. 17, 2012 internal Georgetown email summarizing Union Pacific's decision to select Holland's Rail Vision Systems).

*Applicable Law*

The determination of willful infringement involves a two-pronged analysis.  First, a patentee must make a showing of "objective recklessness."  *In re Seagate Tech., LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007) (en banc).  This requires "clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent."  *Id*.  In general, an accused infringer can overcome the objective prong if it "relies on a reasonable defense to a charge of infringement."  *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs. Inc.*, 682 F.3d 1003, 1005 (Fed. Cir. 2012) (en banc).  When this prong turns on fact questions, "the judge remains the final arbiter of whether the defense was reasonable."  *Id*. at 1006.  Second, if the objective standard is satisfied, the patentee must

demonstrate that the objectively-defined risk "was either known or so obvious that it should have been known to the accused infringer." *Id*. at 1005. The jury determines the subjective prong. *Id*. at 1008.

A court may enhance the jury's damages award by up to three times. 35 U.S.C. § 284. Although Section 284 does not recite all the various bases upon which a district court may increase damages, "it is well established that enhancement of damages may be premised upon a finding of willful infringement." *Johns Hopkins Univ. v. CellPro, Inc.*, 152 F.3d 1342, 1364 (Fed. Cir. 1998). When willful infringement is found, the Federal Circuit presumes damages will be enhanced but, if they are not, the court "should provide reasons for not increasing a damages award." *See Jurgens v. CBK, Ltd.*, 80 F.3d 1566, 1572 (Fed. Cir. 1996).

In addition to willfulness, courts normally consider the non-exclusive "Read Factors" in deciding whether to enhance damages and the amount of the enhancement: (1) whether the infringer deliberately copied the ideas of another; (2) whether the infringer investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; (3) the infringer's behavior as a party to the litigation; (4) the defendant's size and financial condition; (5) the closeness of the case; (6) the duration of the defendant's misconduct; (7) remedial action by the defendant; (8) the defendant's motivation for harm; and (9) whether the defendant attempted to conceal its misconduct. *See Read Corp. v. Portec, Inc.*, 970 F.2d 816, 827 (Fed. Cir. 1992) (abrogated in part on other grounds by *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) (en banc)). An award need not rest on any particular factor, and not all relevant factors need to weigh in favor of an enhanced award. *See SRI Int'l., Inc. v. Advanced Tech. Labs., Inc.*, 127 F.3d 1462, 1469 (Fed. Cir. 1997).

Willfulness

***Objective Prong***

Holland argues that it did not act recklessly because it had a reasonable noninfringement position. Docket No. 309 at 4. Holland describes its noninfringement defense as that it "never used any processor . . . and never performed the claimed algorithm steps to process data as required by Claim 16." *Id.* Holland also claims it had a reasonable belief the '329 Patent was invalid as evidenced by the fact that the Patent Office granted Holland's Reexamination Request the day after trial. *Id.*

Holland's noninfringement defenses through trial were unreasonable. Initially, Holland's noninfringement arguments were based on the alleged functionality of the accused Rail Vision Systems. Docket No. 37 at 10–11 (Holland's response to Georgetown's motion for preliminary injunction, claiming that Holland does not "analyze a frame" as required by step (a) of the algorithm of claim 16). Based on the briefing, the Court rejected Holland's positions and found that Georgetown was likely to prevail on the merits of its infringement claim. Docket No. 51 at 5–6.

Holland then moved for early claim construction and summary judgment of noninfringement. Docket No. 78. Holland asserted that the accused Rail Vision Systems capture and process data in a different manner than required in the algorithm of claim 16. *Id.* at 14–15. The Court rejected Holland's argument and denied its Motion, which "relied entirely on Holland's proposed constructions, all of which the Court [] declined to adopt." Docket No. 146 at 3; Docket No. 147 at 11–12 (*Markman* Order describing Holland's claim construction arguments as "self-contradictory").

From that point on, Holland argued its divided infringement theory (or "no single infringer" theory) that it presented through summary judgment briefing, trial, and into post-trial. Holland argued that it does not infringe because it contracts a foreign entity (Rail Vision UK) to process the data. Holland's focus was no longer on the technical aspects of the Rail Vision Systems, but instead on the fact that Holland's hardware collected the data and shipped it to be processed at Rail Vision UK in the United Kingdom. In a second motion for summary judgment, Holland argued that this arrangement created an issue of divided infringement whereby Holland did not infringe because it did not "perform[] each step in the asserted claim within the United States." Docket No. 141 at 6–8.

Holland's position was wrong as a matter of law, because the asserted claim 16 is a *system* claim and the law of divided infringement that Holland relied on applies only to *method* claims. *See Akamai Techs., Inc v. Limelight Networks, Inc.*, 786 F.3d 899, 910 (Fed. Cir. 2015) (panel decision) ("only method claims can raise an issue of divided infringement") *vacated Akamai Techs., Inc v. Limelight Networks, Inc.*, 786 F.3d 899, 910 (Fed. Cir. Aug. 13, 2015) (en banc).[5] Holland argued that under *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1318 (Fed. Cir. 2005), Georgetown "must prove that Holland performs each step in the asserted claim within the United States." Docket No. 141 at 6. But that is *NTP's* holding for method claims; for system claims, like asserted claim 16, "[t]he use of a claimed system under section 271(a) is the place at which the system as a whole is put into service, i.e., the place where control of the system is exercised and beneficial use of the system obtained." *NTP*, 418 F.3d at 1317.

---

[5] The en banc decision in *Limelight* came out after the parties' post-trial hearing. Neither party filed any supplemental briefing. From the Court's independent reading of the decision, it does not support any argument Holland made during this litigation.

Holland continued pursuing this faulty theory by requesting leave to file a third summary judgment motion, which the Court denied. Docket No. 190 at 1. Holland's request was ostensibly based on the Supreme Court's decision in *Limelight*. Docket No. 157 at 1 (stating that the *Limelight* decision "makes dispositive the issue of divided infringement in this case."). Holland's argument that *Limelight* applied to the present case is particularly questionable because the Court had recently rejected Holland's argument that claim 16 includes method limitation. Docket No. 146 at 5–6. The Court denied Holland's related request in its motion to amend the DCO, finding that Holland misquoted the Supreme Court and that "*Limelight* is not the intervening change in the law that Holland claims it to be." Docket No. 190 at 1.

Despite these rulings, Holland continued to argue its divided infringement theory case through trial. Docket No. 234 at 6–7 (Joint Pretrial Order); Docket No. 223-1 at 45–46 (proposed jury instructions relating to the law of divided infringement as to method claims). Holland argues that the jury instructions were based on the authority cited in its summary judgment motions. Docket No. 310 at 7. That is true, but the final charge was limited to instructions that relate to system claims—the Court *declined* Holland's request to include the instructions for method claims. Compare Docket No. 223 at 45–46 with Docket No. 271 at 13. At trial, Holland continued to focus on the standard for method claims, *see, e.g.*, Docket No. 267 (04-10-2015 A.M. Trial Tr.) at 27:19–24 (Dr. Martens testifying that Holland does not perform the claimed algorithm), 28:6–29:14; Docket No. 260 (04-10-2015 P.M. Trial Tr.) at 46:23–47:8 (Holland's closing stating that "[i]f you don't find that Holland performs every element and, in fact, if you find that Holland does not perform any single element or paragraph or phrase or word, then you cannot find infringement"). Holland's continued reliance on a previously rejected noninfringement position is objectively baseless.

At trial, Holland also briefly discussed how the ██████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████  █

████████████████████████████████████████████████████████████

██████████████████████████████████████████████  *Id*. at 37:4–5.

The Court did not require that "orientation" have an angle or rotational component, but construed "orientation" to have its plain and ordinary meaning. Dr. Martens' testimony appears to incorporate such a requirement and thereby limits the claim to measuring misaligned (rather than sunken) tie plates. *See, e.g.*, *id.* at 19:20–17. As the parties' briefing accompanying Holland's motion for judgment as a matter of law makes clear, requiring "orientation" to have an angular component is a claim construction argument. *See* Docket No. 301 at 26–29 (Holland's motion), and Docket No. 311 at 12–14 (Georgetown's response). Raising that issue now does not support Holland's motion for judgment as a matter of law. Though a closer call, this claim construction argument does not render Holland's noninfringement positions reasonable. This is particularly true when so much of Holland's focus was on its erroneous "no single party infringer" theory.

Holland separately argued the fact that Georgetown did not move for summary judgment conclusively shows that Holland's noninfringement defense was reasonable. Docket No. 310 at 3–4. However, failure to timely move for summary judgment does not necessarily dispose of the issue. *See Oplus Technologies, Ltd. v. Vizio, Inc.*, 782 F.3d 1371, 1375 (Fed. Cir. 2015).

Georgetown explains that it did not receive the source code until after the deadline for filing letter briefs to request summary judgment motions. Docket No. 316 at 4.

Moreover, Holland's invalidity case had similar problems. Holland dropped its invalidity case two days before trial. However, the Court notes that through summary judgment briefing, Holland's invalidity arguments were not compelling. The Court rejected Holland's invalidity argument during the preliminary injunction proceedings as "conclusory." Docket No. 51 (Report and Recommendation) at 7. Likewise, Holland's subsequent indefiniteness argument lacked support. Docket No. 146 at 5–7. Though the Court never substantively ruled on Holland's obviousness defense, Georgetown argues it is baseless as well. None of Holland's proffered prior art combinations were alleged to disclose a processor programmed to detect misaligned or sunken tie plates. Docket No. 139 (Georgetown's response to Holland's MSJ of Validity) at 12–16; *see also* Docket No. 300 at 6 (Georgetown explaining the limitations missing from the various combinations). At least one of the references in each combination was examined during the prosecution of the '329 Patent. Docket No. 139 at SOF ¶¶ 11–16. Georgetown also alleged that Holland failed to identify any motivation to combine the prior art references. *Id.* at 16–18.

Holland responds that its invalidity case was not baseless because the U.S. Patent and Trademark Office ("PTO") granted Holland's Reexamination Request on August 15, 2015, based on the same prior art relied upon in its motion for summary judgment of invalidity. *See* Docket No. 310 at 4 & n.5. However, as the Federal Circuit has observed, "a requestor's burden to show that a reexamination order should issue from the PTO is unrelated to a defendant's burden to prove invalidity by clear and convincing evidence at trial." *Procter & Gamble Co. v. Kraft Foods Global, Inc.*, 549 F.3d 842, 848 (Fed. Cir. 2008). This is particularly true here, where the PTO eventually terminated the Reexamination and concluded that the prior art

combination "does not teach a system capable of detection [sic: detecting] a misaligned or sunken tie plate of the railroad track bed because the disclosed process does not record the relevant data that would require [sic: be required] for performing the claimed calculation. It is also noted, that the specific claimed algorithm is not disclosed." Docket No. 354-1, Ex. A (Reexamination Certificate).

Considering all of the above, Georgetown produced clear and convincing evidence that Holland acted despite an objectively high likelihood that its actions constituted infringement of a valid patent, and the Court hereby finds the objective prong of *Seagate* has been satisfied. *See In re Seagate Tech.*, 497 F.3d at 1371. The Court notes that simply because a defense to infringement proves to be unsuccessful does not make that defense unreasonable. However, as has been demonstrated above, Holland continued to rely on arguments through trial that were substantially weak and rejected time and again.

### *Subjective Prong*

By returning a verdict of willful infringement, the jury found that that this objectively-defined risk was known, or should have been known, to Holland. Docket No. 273. Georgetown presented substantial evidence supporting this finding. Accordingly, and in light of the Court's finding that Georgetown satisfied *Seagate's* objective prong, the Court **finds** Holland's infringement was willful.

### Enhancement – Factors

Upon a finding of willful infringement, the Court may, in its discretion, enhance damages by up to three times. 35 U.S.C. § 284; *see SRI Int'l Inc. v. Advanced Tech. Labs., Inc.*, 127 F.3d 1462, 1468–69 (Fed. Cir. 1997). This determination normally considers the *Read* factors. *See*

*Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826–828 (Fed. Cir. 1992), (abrogated on other grounds by *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 975–77 (Fed. Cir. 1995) (en banc)).

### Read Factor 1: Copying

Georgetown argues that Holland deliberately copied the Aurora system, relying on the following evidence: (1) through the parties' non-disclosure agreements, Holland engaged in confidential discussions with Georgetown as to the details of the Aurora system; (2) while these confidential discussions were ongoing, Holland was working with Rail Vision UK to develop a competing technology; (3) Holland's Rail Vision Systems is very similar to the Aurora system (both include cameras and light sources mounted to a track inspection vehicle and a processor for detecting sunken tie plates); and (4) Holland admitted it wanted and needed to offer automated inspection of misaligned or sunken tie plates for its customers. Holland responds that (1) it could not have copied the algorithm because Rail Vision UK developed the software on its own, and (2) that Georgetown only presents circumstantial evidence of copying. Docket No. 309 at 7–8.

Holland's first argument is without merit. The fact that Holland partnered with Rail Vision UK and directed them to develop the software portion of the infringing Rail Vision Systems does not preclude a finding that Holland copied Georgetown's technology. An infringer can copy another person's patented invention even though the infringer directs another to build the copy.

Holland's second argument is more valid. Georgetown does present only circumstantial evidence that Holland copied the technology. However, the evidence presented, circumstantial or not, is compelling. Under two non-disclosure agreements, Georgetown disclosed to Holland the details of its Aurora system. The only detail that was not shared was Georgetown's source code used to process the collected data. However, the jury found that Rail Vision UK's source

code did contain the claimed algorithm, which is not surprising considering that both systems contain similar hardware to make the same measurements of identical railroads. That Holland developed a very similar system under these circumstances is strong evidence of copying and favors enhancing damages.

***Read Factor 2: Investigation and Good Faith Belief of No Liability***

Georgetown argues that Holland was aware of the '329 Patent as a result of the parties' business discussions and Georgetown's marking programs, yet Holland "failed to perform any investigation as to whether it infringed the '329 Patent when developing its Rail Vision Systems." Docket No. 302 at 9. Holland responds that it stated its good faith belief of non-infringement in its response to Georgetown's January 16, 2013 cease-and-desist letter. Docket No. 309 at 8–9, PX220. Specifically, Holland claims that the industry has for decades used lights, cameras, and lasers to collect data. Docket No. 309 at 9. Holland further claims that the Rail Vision Systems uses a different software algorithm. *Id.*

A belief that individual components of a patented system are not themselves patentable is not a good faith belief of noninfringement or invalidity. Likewise, ignorance of the details of Rail Vision UK's source code is not a good faith defense. More importantly, Holland's statements in its 2013 response to the cease-and-desist letter do not establish a good faith belief that Holland designed around the '329 Patent when it developed its Rail Vision Systems in the 2009–10 time frame. Holland was provided with highly confidential information regarding Georgetown's Aurora system and the evidence shows that Holland knew the Aurora system was patented—yet there is no evidence that Holland made an investigation into the scope of Georgetown's patent rights, made any attempt to design around the patent, or had a good faith belief of noninfringement. Accordingly, this factor favors enhancement.

***Read Factor 3: Conduct During Litigation***

Georgetown argues that Holland engaged in litigation misconduct by "offer[ing] shifting and contradictory positions from the early stages of this litigation, made several baseless attempts to strike Georgetown's experts, and re-litigated arguments that the Court had already ruled on and rejected."  Docket No. 300 at 1.  Georgetown also argues that Holland used "its relationship with the Rail Vision [UK] as a sword to produce information when helpful to its case and as a shield to withhold information that harmed its case." *Id*.  Holland responds that the mere fact that the jury rejected Holland's defenses does not make them frivolous.  Docket No. 309 at 10.  Holland also claims that Georgetown engaged in similar gamesmanship, such as dropping its doctrine of equivalents case during trial and amending its infringement contentions to include the 2-D Line Scan System after initially admitting that it did not infringe during the preliminary injunction proceedings.  Docket No. 309 at 10.

The Court more fully addressed these arguments regarding Georgetown's Motion for Declaration of Exceptional Case and Award of Attorneys' Fees above.  In sum, when considered individually, none of Holland's actions warrants a finding that Holland engaged in litigation misconduct.  However, when considered collectively, and in light of the weakness of Holland's defenses, Holland's actions reveal an attempt to needlessly multiply proceedings and prolong the case.  Accordingly, this factor slightly favors enhancement.

***Read Factor 4: Defendant's Size and Financial Condition***

Georgetown argues that a "trebled damage award would only be a very small fraction of Holland's overall revenue."  Docket No. 302 at 10.  Georgetown relies on trial testimony to show that Holland's revenues from the division that oversees the Rail Vision Systems had total revenues of ███████████████, which was about ██████████ of Holland's total revenues.

Docket No. 263 (04-07-2015 P.M. Trial Tr., Sealed Portion No. 5) at 83:5–84:10 (Madderom). Holland argues that this revenue "came from the many other non-infringing products and services" and that "Georgetown has simply not shown how a 10% burden on non-infringing business streams could not impair Holland's financial well-being." Docket No. 309 at 11.

The size and health of the two companies is not disputed. Holland is an international company of about 1,100 employees. Docket No. 302 at 10. Georgetown has approximately 130 employees. *Id.* A trebled damage award of $4,623,999 would represent less than one percent of Holland's annual revenue, or approximately nine percent of the revenue of the relevant business division. On the other hand, Holland made very little money from its Rail Vision Systems (due in large part to the preliminary injunction). Based on this evidence alone, the Court cannot conclude that a trebled award would "unduly prejudice [Holland's] non-infringing business." *See Creative Internet Advertising v. Yahoo Inc.*, 689 F. Supp. 2d 858, 866 (E.D. Tex. 2010) (finding Yahoo's profit margins to be evidence that it was large and profitable enough to pay enhanced damages). Accordingly, this factor slightly favors enhancement.

### Read Factor 5: Closeness of the Case

Georgetown argues the case was not close. For support, Georgetown relies on the fact that the jury deliberated for just over an hour and returned a verdict in Georgetown's favor on all counts for the exact amount Georgetown requested. Docket No. 302 at 11. Georgetown also states that the case was one-sided from the beginning, starting with Holland losing the preliminary injunction, which required a finding that Georgetown was likely to succeed on the merits, and going through claim construction proceedings, where Holland lost every argument it raised. *Id.* Georgetown states that the latter stages of the litigation also show the case was not close: in addition to being ordered to produce the Rail Vision UK source code, Holland lost all of

its summary judgment motions and several (and duplicative) *Daubert* requests. Holland responds by stating its noninfringement arguments were viable and that Georgetown never filed a motion for summary judgment of infringement.

As previously detailed throughout this Order, Holland's noninfringement defenses were not strong. This is not surprising given the fact that Aurora is the commercial embodiment of claim 16 and considering its similarity to Holland's Rail Vision Systems. That Georgetown did not move for summary judgment of infringement does not change the analysis. As was explained above, Georgetown did not receive the source code until it was too late to move for summary judgment. In addition, Georgetown's damages case was not excessive: Georgetown showed this was a two-supplier market, and that if Holland was not infringing, Union Pacific would have contracted with Georgetown. This hypothetical contract was based on the very proposals that Georgetown sent to Union Pacific and comported with Georgetown's contracts with other Class I Railroads. Again, this was not a close case and given the reasonable relief Georgetown requested, it could have been resolved in a more efficient manner. Accordingly, this factor favors enhancement.

### Read Factor 6: Duration of the Misconduct

Georgetown argues that this factor favors enhancement because Holland knew of the patent by 2010, yet continued to infringe until the preliminary injunction issued. Docket No. 302 at 12. Holland argues that it stopped any infringing activity, pursuant to the preliminary injunction by removing the Rail Vision Systems lights, cameras, and lasers from its TrackStar vehicles. Docket No. 309 at 12. Holland also argues the only undisputed duration that Holland infringed was a one-year period from January 2013 to January 2014. *Id*. at 12–13.

The evidence presented at trial shows that Holland was aware of the '329 Patent at least as early as 2010. *See* Docket No. 302 at 9 (listing the advertisements Georgetown took regarding the '329 Patent, the conversations Georgetown had with Holland that included the '329 Patent, and the fact that Georgetown marked its Aurora-based vehicles with the patent number). All throughout this time, Holland was contracting with Rail Vision UK to develop an infringing system. Therefore, Holland's misconduct lasted at least three years. On the other hand, Holland did remove the Rail Vision Systems hardware from its TrackStar vehicles following the preliminary injunction proceedings. Once it was clear that the preliminary injunction applied to both the Rail Vision laser plate-cutting system and the Rail Vision line scan system, Holland complied with the preliminary injunction. Because both parties' positions have merit, this factor is neutral.

### Read Factor 7: Remedial Action

Georgetown argues that this factor favors enhancement because the "record contains no evidence that Holland made any effort to remedy its infringement." Docket No. 302 at 12. Holland responds that it took remedial action by removing the Rail Vision Systems hardware from its TrackStar vehicles following the Court's preliminary injunction. Docket No. 309 at 13. Holland confuses compliance with the preliminary injunction with remedial action. *See Lee v. Accessories by Peak*, 705 F. Supp. 2d 249, 260 (W.D.N.Y. 2010) (finding this favor does not favor enhancement when the accused infringer "consented to entry of a permanent injunction"). Removing the equipment from its TrakStar vehicles (as opposed to simply not using the equipment) does suggest Holland attempted to remediate, but it is just as reasonable to conclude that Holland was preserving the hardware for future use. Given the parties' posture through this

litigation, it is safe to say that the preliminary injunction was necessary to prevent Holland from offering for sale its Rail Vision Systems. Accordingly, this factor slightly favors enhancement.

***Read Factor 8: Motivation for Harm***

Georgetown argues that "Holland's willful infringement resulted from nothing more than its desire to increase its profits and market share by directly competing with Georgetown in a small market by offering infringing technology to Georgetown's customers at a lower price." Docket No. 302 at 13. Holland responds that increasing market share is a legitimate business concern, and therefore does not support enhancement. Docket 309 at 14.

Georgetown spent millions of dollars developing and patenting its Aurora system that automates the process to measure plate cutting. This gave Georgetown the opportunity to exert monopoly power in a market it alone created. Any gain by Holland naturally came at Georgetown's expense. Importantly, Holland was well aware of this fact—Holland and Georgetown competed for the same seven customers and Holland knew no one else offered comparable services. However, there is nothing to suggest that Holland acted out of spite or ill-will toward Georgetown or for any reason other than a desire to capture a piece of the market. Accordingly, this factor is neutral.

***Read Factor 9: Attempt to Conceal Misconduct***

Georgetown argues that Holland concealed its misconduct by entering into two separate non-disclosure agreements with Georgetown while "working with Rail Vision to develop a cheaper infringing technology." Docket No. 302 at 13. Holland responds that "Georgetown incorrectly argues that this factor is met solely due to Holland allegedly concealing its 'relationship' with Rail Vision." Docket No. 309 at 13. Holland also argues that it helped

Georgetown obtain Rail Vision UK's source code during the litigation, which further shows that Holland was not concealing anything. *Id.*

As an initial matter, Holland did not willingly help Georgetown obtain Rail Vision UK's source code. Holland produced the source code only after the Court granted Georgetown's motion to compel. Docket Nos. 131 and 132. Even after the code was produced, Holland challenged its authenticity and admissibility through trial. These actions do not support Holland's argument. However, Holland is correct that failing to disclose its relationship to Rail Vision UK does not equal concealment of its misconduct. That is, this factor is not concerned with misconduct in general, but only misconduct related to infringing activities. *See Harris Corp. v. Fed. Express Corp.*, No. 6:07-cv-1819-Orl-28KRS, 2011 U.S. Dist. LEXIS 96257, at *26 (M.D. Fla. Feb. 28, 2011). With respect to this factor, Holland's dealings with Rail Vision UK only matter to the extent those dealings were infringing actions.

The record is unclear at exactly what point Holland's dealings with Rail Vision UK can fairly be described as infringing activities. Shortly before Holland terminated its second non-disclosure agreement with Georgetown on June 3, 2010, Holland signed a purchase work order for the infringing technology with Rail Vision UK. *See* PX114. Holland was concealing its relationship with Rail Vision UK at this time. By this point, Holland knew of both Aurora's technical details and the '329 Patent. Therefore, for at least some period of time, Holland concealed the fact that it was developing an infringing system. However, Holland stopped any concealment when it started to publicize its system. *See* PX217 (Georgetown letter to Holland referencing Holland's press release in the December 2012 issue of Progressive Railroading). In light of the circumstances, this factor is neutral.

Factors 1, 2, and 5 support enhancement; factors 3, 4, and 7 slightly support enhancement; and factors 6, 8, and 9 are neutral. None of these factors overwhelmingly supports enhancement and several of them are present to the same or a similar degree in nearly any case that involves willful infringement. Just as important, however, is that no single factor weighs against enhancement.

Enhancement is appropriate here to address Holland's willful infringement and conduct. Enhancement of damages by three times the jury verdict of $1,544,333 would result in a total amount of $4,623,999. However, given the totality of the circumstances, enhancing damages to the maximum extent allowable under § 284 is not warranted. As such, the Court awards an additional **$1,000,000** to the jury's damage award, and **ORDERS** Holland L.P. to pay plaintiff Georgetown Rail Equipment Company **$2,544,333** for damages.

## MOTION FOR DECLARTION OF EXCEPTIONAL CASE AND AWARD OF ATTORNEYS' FEES (Docket No. 300)

Georgetown requests the Court declare this an exceptional case under 35 U.S.C. § 285 and award Georgetown its attorney's fees of $1,566,540.35.

### Applicable Law

"The court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. An exceptional case "is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014).

"District courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances." *Id.* at 1756; *see also*

*Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 134 S. Ct. 1744, 1748 (2014) ("[T]he determination of whether a case is 'exceptional' under § 285 is a matter of discretion."); *Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314, 1324 (Fed. Cir. 2011) ("[W]e are mindful that the district court has lived with the case and the lawyers for an extended period."). "After determining that a case is exceptional, the district court must determine whether attorney fees are appropriate," which is within the Court's discretion. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1460 (Fed. Cir. 1998) (citations omitted). Ultimately, a party must prove entitlement to attorney fees by a preponderance of the evidence. *Octane Fitness*, 134 S. Ct. at 1758.

"It is equally necessary for the trial court to explain why this is not an exceptional case in the face of its express finding of willful infringement." *S.C. Johnson & Son, Inc. v. Carter-Wallace, Inc.*, 781 F.2d 198, 201 (Fed. Cir. 1986). Conversely, "[e]ven an exceptional case does not require in all circumstances the award of attorney fees." *Id*. Many factors can determine whether fees are warranted in the finding of willfulness. *Id*. "The trial judge is in the best position to weigh considerations such as the closeness of the case, the tactics of counsel, the conduct of the parties, and any other factors that may contribute to a fair allocation of the burdens of litigation as between winner and loser." *Id*.

## *Analysis*

Georgetown argues that the jury's finding of willfulness alone is sufficient grounds to find the case exceptional. Docket No. 300 at 2–3. In addition to the jury's finding in this regard, Georgetown claims that the case is exceptional for two other reasons. First, Georgetown argues that Holland relied on substantively weak litigation positions, as evidenced by Holland's "frivolous and contradictory" claim construction positions and objectively baseless noninfringement and invalidity arguments. *Id*. at 3–9. Next, Georgetown argues that Holland

engaged in litigation misconduct and needlessly multiplied the proceedings by shifting its litigation positions and making frivolous arguments, such as repeatedly moving to strike Georgetown's experts for relying on inadmissible evidence to form their opinions. *Id.* at 10–14. In response, Holland argues (1) that the jury's subjective finding of willfulness does not make the case exceptional, (2) that its non-infringement positions were "well founded," and (3) that it did not commit litigation misconduct.

As described above, the Court adopts the jury's finding that Holland willfully infringed. This fact alone is a "compelling" indication that this is an exceptional case. *See S.C. Johnson & Son*, 781 F.2d at 201 (noting that "the trial court [must] explain why this is not an exceptional case in the face of its express finding of willful infringement"). Finding willfulness addresses Holland's first two responses to Georgetown's request for fees. Regarding Holland's litigation conduct, there cannot be any serious doubt that Holland's litigation strategies multiplied the proceedings and needlessly increased costs, further justifying Georgetown's request for fees. Several of the most glaring examples are addressed below.

The first example relates to the "significant disparities" between a declaration of one of Holland's witnesses and that same witness's testimony at the preliminary injunction hearing. Docket No. 81 at 5–6 (Order Adopting the Report and Recommendation for granting Georgetown's preliminary injunction). At the hearing, Holland offered the contradictory position that it made almost no money from its Rail Vision Systems, but requested that Georgetown post a $2 million bond to protect Holland if an injunction were wrongly entered. *Id.* at 3.

Another example involves the Rail Vision source code. Holland initially produced code, but Georgetown's expert declared it was only portions of the code "annotated by defendants in

an extreme way." Docket No. 118-1 (Decl. of Dr. Myler) ¶ 4. Holland's first of two written threats for Rule 11 sanctions accompanied this annotated source code. In that letter, Holland stated that "with this letter is a CD containing a copy of Rail Vison[ UK]'s Source Code associated with the Accused Instrumentality that we received directly from Rail Vision [UK] only yesterday." Docket No. 300-2, Ex. A (Nov. 26, 2013 letter from Holland's counsel). Holland further stated that the source code made clear that Georgetown's infringement claim was without merit, and that "Holland reserve[d] the right to pursue relief in accordance with FED. R. CIV. P. 11" if Georgetown [did] not withdraw its claim. *Id.*

Despite claiming the production answered the ultimate issue of infringement in the case, Holland later challenged its authenticity. *See* Docket No. 241. The Court is troubled that Holland moved to exclude the code that it produced to Georgetown, especially considering that Holland had previously stated that the code so clearly established noninfringement to the point that Holland threatened sanctions. The Court eventually ruled (without knowledge of Holland's prior statements regarding the value of the annotated code) that Georgetown could rely on the annotated code only as a demonstrative because Holland eventually produced the actual source code. Docket No. 249 at 1; Docket No. 255 (04-08-15 A.M. Trial Tr.) at 10:2–11.

Finding the annotated source code insufficient, Georgetown made further requests for the actual, non-annotated, source code. Because Holland resisted, Georgetown eventually filed a motion to compel. *See* Docket No. 118. The Court granted the motion and Holland produced the code, albeit one week after the Court-ordered deadline. Docket No. 189 at 7. After producing the source code, Holland later challenged its authenticity. *See* Docket No. 179-12 (Def.'s Obj. to Plf.'s Ex. List) at 20–21.

The next example regards Holland's repeated attempts to stretch beyond reasonable bounds the law of divided infringement of method claims to the system claim at issue in this case. The merits of this argument are addressed more fully above related to Georgetown's Motion for a Finding of Willfulness. For purposes of Georgetown's request for fees, the Court is most concerned with the fact that, even after the Court clearly rejected Holland's theories, Holland continued to assert them throughout trial. Holland made variations of its divided infringement argument in its Motion for Summary Judgment of Noninfringement, (Docket No. 141), Motion to Amend the DCO (Docket No. 157), and Response to Georgetown's Motion for Leave to Amend its Infringement Contentions (Docket No. 169 at 8–9). These arguments were individually rejected. Docket Nos. 146 at 5–6, 190 at 2–3. Nevertheless, Holland continued to assert its divided infringement theory. *See* Docket Nos. 183 at 7 (Holland's Trial Brief describing its divided infringement theory), 234 at 6–7 (Joint Pretrial Order stating that "the present lawsuit cannot be maintained because Holland, by itself, cannot perform all of the steps in the asserted claim"), 233-1 at 45–46 (Holland's proposed jury instruction that included several paragraphs devoted to the law of divided infringement as applied to method claims).

The final example is that Holland repeatedly moved to exclude Georgetown's technical expert, Dr. Myler, for relying on inadmissible evidence (magazine articles, website pages and other "irrelevant hearsay") to form his opinions. Docket No. 169 at 2, 10–11 (opposition to motion to amend infringement contentions); Docket No. 175 at 4 (letter brief for leave to strike Dr. Myler). The Court denied those requests, explaining that Holland's challenges were "insufficient under the *Daubert* Standards." Docket No. 190 at 3 (quoting FED. R. EVID. 703 that "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted").

Holland then filed a motion *in limine* raising these very same arguments, which was likewise denied. Docket Nos. 193, 202.

After several orders on this issue, Holland sent a second Rule 11 letter to Georgetown's counsel, threatening to move for sanctions if Georgetown did not withdraw its "unsubstantiated infringement contentions." Docket No. 300-3, Ex. B (Mar. 2, 2015 letter from Holland's counsel). In the attached Rule 11 Motion, Holland continued to argue that Georgetown's infringement contentions and its entire infringement case were deficient because Dr. Myler "rel[ied] on magazine articles, website pages and other irrelevant hearsay as alleged factual support for its infringement." *Id*. at 4. The timing and content of this letter is troubling given the fact that it raised arguments the Court had previously addressed on several occasions.[6]

In response to Georgetown's request for an exceptional case finding, Holland generally addresses several (but not all) of these criticisms in isolation. Docket No. 310 at 9–14. For example, Holland argues that Georgetown shifted its own positions during litigation when it amended its infringement contentions to include the Line Scan portion of the Rail Vision Systems. *Id*. at 10. Georgetown, however, had good cause to amend its contentions after reviewing the source code that the Court ordered Holland to produce. *See* Docket No. 189. Holland's inconsistent positions, by contrast, did not arise out of new evidence.

Holland also argues that its noninfringement position regarding divided infringement was not baseless because the jury instructions cited the authority Holland relied on to make its argument. Docket No. 310 at 7 (citing to the benefit and control test as stated in *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1317 (Fed. Cir. 2005)). Holland also claims

---

[6] Holland filed an emergency motion for leave to file a motion to strike Dr. Ugone on different grounds two weeks prior to trial. Docket No. 225. The Court denied the request and explained that Holland's arguments were untimely and potentially irrelevant, and at most go to the weight of Dr. Ugone's testimony. Docket No. 235.

Georgetown's criticisms of Holland's reliance on "divided infringement" is "form over substance." *Id*. at 8. That is, Holland asserts it "always maintained and asserted the proper legal construct as set forth in cases like *NTP* [and] *Limelight*." *Id*. & n.7.

This point is disingenuous at best. Through trial, Holland argued for standards that applied to method claims, despite the fact that claim 16 is a system claim. *See* Docket No. 180-1, Proposed Final Jury Instructions No. 5.3 at 42 (Holland proposing an instruction that "[d]irect infringement requires that a party perform or use every step of a claimed *method*") (emphasis added). As described above, Holland made repeated attempts to treat claim 16 as a method claim—but the final jury instructions cited to the control and benefit test for system claims as stated in *NTP*.

Holland also argues that Georgetown's other complaints—that Holland continued to maintain its objections to Georgetown's experts and Holland's handling of Rail Vision UK's source code—did not prejudice Georgetown and do not support an award of fees. *Id*. at 12–14. Holland minimizes the effect these actions caused. This conduct increased the cost of litigation for both parties and delayed resolution of a case that ultimately was not a close call.

It should be noted that none of Holland's actions, in isolation, was so egregious as to make this case exceptional. Though unfortunate, there is nothing "exceptional" about a party resisting its discovery obligations, maintaining already rejected objections to exhibits or testimony into trial, filing weak *Daubert* requests, or even making repeated Rule 11 sanction threats.[7] However, when a party does all of these things, and continues to raise rejected

---

[7] Though not specifically briefed, there were other events that, when viewed in the totality of the circumstances, contribute to this pattern of unnecessary delay and motion practice. *See, e.g.*, Docket Nos. 116 and 112 (Holland's attempt to apply a retroactive prosecution bar); Docket No. 239 at 21:16–22:10 (second pretrial where Holland, perhaps errantly, wavered on whether a witness from Rail Vision UK would appear for trial, despite a prior ruling on the matter); Docket No. 357 (Order on Georgetown's Bill of Costs that reveals that Holland too quickly relied on

arguments that are found to be objectively unreasonable, the Court can only conclude the party needlessly multiplied the proceedings at the expense of the opposing side and the Court. This Order should not be read to condone a "kitchen sink" approach to a motion for fees—but in the rare case where the court and jury have found willful infringement and the accused infringer engaged in conduct that needlessly drew out resolution of the issues to the extent that is present here, the totality of the circumstances warrants the award of fees.

Georgetown provided substantial support for its request of $1,566,540.35. *See* Docket No. 300-1 (Herberholz Decl.) ¶¶ 4–33, Exs. A–G (detailing the hours and hourly rate for the attorneys involved at the various stages of the litigation). According to the American Intellectual Property Law Association's Report of the Economic Survey 2013, the total fees billed by Georgetown's counsel are below the average for the total fees for similar cases both nationally and in Texas. Docket No. 300-1 ¶ 29, Ex. I (estimated fees for Texas attorneys in similar cases are $2,031,000, while the national average is $2,100,000). Similarly, the hourly billing rates for Georgetown's attorneys and paralegals are below the average for patent litigation cases in Texas. *Id*. ¶¶ 31–32. Despite the detailed support Georgetown provided, in a single sentence in its response brief Holland requested a hearing on the amount of fees. Docket No. 310 at 14. However, Holland did not contest the reasonableness of Georgetown's fees in any of the briefing or at the post-trial hearing.

These fees were necessarily and reasonably incurred in the prosecution of this case, and the billing rates for Georgetown's attorneys were reasonable and, in fact, below market rates for patent litigation counsel in Texas and nationally. Likewise, Georgetown's total fees are in line with or below the average fees incurred in similar patent infringement cases in Texas and

---

motion practice rather than the meet and confer process by objecting to amounts as small as $1.76 that Georgetown easily substantiated).

nationally.  Further, this case was handled with the appropriate level of diligence and concern for costs and efficiencies, and Georgetown received a complete victory at trial.  Accordingly, Georgetown's Motion for Declaration of Exceptional Case and Award of Attorneys' Fees (Docket No. 300) is **GRANTED** and the Court **awards** $1,566,540.35 in attorney's fees to be paid to Georgetown.

### MOTION TO SUPPLEMENT POST-TRIAL HEARING RECORD (Docket No. 334)

Holland moves to provide supplemental information regarding its offer for judgment following statements made by Georgetown's counsel at the June 30, 2015 post-trial hearing.  At the hearing, Georgetown's counsel stated that Holland should not have forced Georgetown to go through the expense of trial to obtain an injunction. Specifically, Georgetown stated:

> MR. HERBERHOLZ: Your Honor, our next motion is Georgetown's motion for exceptional case and attorneys' fees.

> And I want to preference this motion by saying that we really shouldn't be here. This case in Georgetown's – from Georgetown's perspective should have been over, really, before it started.

> If you look back at the cease and desist letters that we've seen in this trial, what Georgetown wanted at the beginning of this case is an injunction. Georgetown wanted to make sure that Holland was not using its Rail Vision Systems. And specifically, Georgetown wanted to make sure that Holland wasn't measuring misaligned or sunken tie plates.

> If Holland would have turned off that functionality, we wouldn't be here today. But now here we are two years and $2 million later still fighting about injunctions, still fighting about whether or not Holland needs to be permanently enjoined.

Docket No. 330 at 117.

Holland now provides the Court with a copy of its Rule 68 Offer of Judgment, where on October 14, 2014 it offered to abide by a permanent injunction of its own terms.  Docket No. 334-1, Ex. 1.  Georgetown refused that Offer.  Holland now submits the Offer to show that "long

prior to trial, Holland was willing to permanently cease using the Rail Vision technology." Docket No. 338 at 1.

While Georgetown does not oppose Holland's request to supplement the record, it filed a response "to explain why Holland's Offer of Judgment was unreasonable and unacceptable." Docket No. 336 at 2. In broad terms, Georgetown found the Offer unacceptable because it was made after "on the eve of trial, after the expenditure of substantial fees and expenses" and included an injunction that was drafted too narrowly. *Id.* at 2–4. The unopposed Motion to Supplement (Docket No. 334) is **GRANTED**.

In light of this briefing, the Court is obliged to comment on Georgetown's statements at the post-trial and Holland's Offer. Having agreed with the jury that Holland willfully infringed, the Court cannot from its current vantage look back over the litigation and determine precisely when Holland should have conceded to Georgetown's demands or what the exact form of those demands should have been. Hindsight bias clouds a fair and accurate assessment. However, given the history between these two companies, the weakness of Holland's litigation position, and the fact that the jury found willful infringement, the Court can say with confidence that Georgetown has not compromised its position by viewing the Offer of Judgment as too little, too late.

**SIGNED this 16th day of June, 2016.**


_Robert W. Schroeder III_
ROBERT W. SCHROEDER III
UNITED STATES DISTRICT JUDGE